**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| Northstar Healthcare Holdings, Inc., | Case No. 19-12262 (CSS) |
| Debtor. | |
| In re: | Chapter 7 |
| Northstar Healthcare Acquisitions, L.L.C., | Case No. 19-12263 (CSS) |
| Debtor. | |
| In re: | Chapter 7 |
| Nobilis Health Corp., | Case No. 19-12264 (CSS) |
| Debtor. | |
| | Hearing Date: TBD |
| | Objection Date: TBD |

**EXPEDITED MOTION OF BBVA USA F/K/A COMPASS BANK, AS AGENT, TO (A) TRANSFER VENUE TO THE THIS COURT, AND (B) STAY ANY PROCEEDINGS IN THE HOUSTON COURT PENDING A DECISION FROM THIS COURT**

BBVA USA f/k/a Compass Bank ("BBVA USA"), in its capacity as administrative agent (the "Agent"), by and through its undersigned counsel, for itself and the lenders (the "Lenders") party to certain secured credit facilities, files this motion (this "Motion")[1] to (i) transfer venue of the involuntary bankruptcy case brought by four (4) Petitioning Creditors[2] against Northstar Healthcare Surgergy Center – Houston, LLC (the "Putative Debtor") in the United States

---

[1] Contemporaneously with the filing of this Motion, the Agent has filed motions to expedite and for a temporary stay of proceedings in the Houston Case, so that this matter may be considered by this Court at this Court's earliest convenience.  In addition, following this Court's ruling on this Motion, the Agent intends to file a motion to (i) dismiss the involuntary case against the Putative Debtor, as a bad faith filing, or (ii) in the alternative, determine that certain provisions set forth in executory contracts are unenforceable *ipso facto* clauses.

[2] The term "Petitioning Creditors" shall mean (i) Carl F. Palumbo, (ii) Navin Subramanian, (iii) Alan Jeffrey Rechter Heritage Trust, and (iv) OPST – The Surgery Center, LLC.

Bankruptcy Court for the Southern District of Texas - Houston Division (the "Houston Court") in

Case No. 19-36847 (the "Houston Case") to this Court pursuant to 28 U.S.C. §§ 1404, 1408, and

1412 and Rule 1014 of the Federal Rules of Bankruptcy Procedure, and (ii) to stay any proceedings

in the Houston Case pending a decision from this Court on the instant Motion. In support of this

Motion, the Agent incorporates the Declaration of Jon McCurdy, Senior Vice President of BBVA

USA, as Agent, in support of the instant Motion and respectfully states the following:

## PRELIMINARY STATEMENT

1.      On October 21, 2019, the above-referenced Debtors, (a) Northstar Healthcare

Acquisitions L.L.C. ("Northstar Acquisitions"), (b) Northstar Healthcare Holdings, Inc., and (c)

Nobilis Health Corp. (collectively, the "Debtors"), filed with this Court their voluntary petitions

under Chapter 7 of the Bankruptcy Code (the "Debtor Cases"). Since about that date, Alfred T.

Giuliano has been acting as the Chapter 7 Trustee (the "Chapter 7 Trustee") for the Debtors and the

Debtors' assets.

2.      On December 17, 2019, the Petitioning Creditors filed an involuntary chapter 7

petition against the Putative Debtor in the Houston Court. The Putative Debtor is a direct, wholly-

owned subsidiary of the Debtor Northstar Acquisitions, which is itself a wholly-owned subsidiary

of Debtor Northstar Healthcare Holdings, Inc., which is itself a wholly-owned subsidiary of Nobilis

Health Corp. The Debtors are "affiliates", as defined by section 101(2) of the Bankruptcy Code, of

the Putative Debtor.  Pursuant to Bankruptcy Rule 1014(b), since this Court was the court in which

the cases involving each of the Debtors was first filed approximately two months earlier, this Court

would have the sole authority to determine the venue in which a bankruptcy case for an affiliate of

the Debtors should proceed.

3.      The facts of this case present a situation warranting a change of venue for a number

of reasons, including, among other things, the facts that (1) the Petitioning Creditors have

2

wrongfully initiated their involuntary case against the Putative Debtor, which entity is wholly-owned and controlled by Northstar Acquisitions, which is subject to the control of the Chapter 7 Trustee, (2) the entire management team of the Putative Debtor was the management of the Debtors, (3) the sole property interests of the Putative Debtor are the membership interests in the Elite Entities (together with any and all distributions received by the Putative Debtor on account of such membership interests),[3] (4) the membership interests owned by the Putative Debtor (together with any and all distributions received by the Putative Debtor on account of such membership interests) are subject to the first-priority, unavoidable, perfected liens of the Agent securing the repayment of approximately $130 million of indebtedness owed by the Debtors, the Putative Debtor and certain of their affiliates, and (5) the filing of the involuntary petition by the Petitioning Creditors was wrongfully instituted to control the Putative Debtor to collect their unsecured debt and to improperly advance their interests as claimholders against the Putative Debtor and equity holders in the Elite Entities.

4.    This Court may already be familiar with the principals and complex organizational structure of the Debtors and their affiliates. The Chapter 7 Trustee is familiar with all of these assets and the relationship between the Debtors and the Putative Debtor and the various Loan Documents (as defined below) by which the Agent claims its first-priority perfected security interest in all of the assets of the Putative Debtor.  And the Chapter 7 Trustee and Agent have developed an efficient working relationship that will maximize the value of the several estates and subsidiaries for the benefit of their creditors as their interests may appear. For these reasons, this Court is uniquely positioned to oversee the involuntary Houston Case.

---

[3] The term "Elite Entities" as used herein means (i) Houston Metro Ortho and Spine Surgery Center, LLC, (ii) Elite Center for Minimally Invasive Surgery, LLC, (iii) Elite Hospital Management, LLC, and (iv) Elite Sinus Spine and Ortho, LLC.

3

5.      The Agent respectfully submits that, for the reasons set forth above and discussed more fully below, both the interests of justice and convenience of the parties justify the transfer of venue to this Court.

### JURISDICTION

6.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and other applicable law. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Agent confirms its consent, pursuant to the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order or judgment by the Court in connection with this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

7.      The statutory and other bases for the relief requested herein and venue of this Motion are 28 U.S.C. §§ 1404, 1408, 1409, and 1412 and Rule 1014 of the Federal Rules of Bankruptcy Procedure.

8.      The Agent has standing to bring this Motion, because (i) the Agent is the major secured creditor of the Putative Debtor with a blanket lien against all of its assets and any forfeiture of the assets of the Putative Debtor will directly and materially adversely affect the Agent (and the debt that is jointly owed by the Debtors), and (ii) the Agent could exercise its authority (by reason of the pledge of all of the membership interests in the Putative Debtor to the Agent and pursuant to the related rights and remedies granted to the Agent by the sole member of the Putative Debtor pursuant to the Loan Documents) as attorney-in-fact for the sole member of the Putative Debtor to appoint a chief restructuring officer to contest the involuntary petition.

# BACKGROUND

## I.  Credit Agreement and Related Loan Documents

9.      The Debtors, the Putative Debtor and approximately forty-five affiliates of the Debtors (collectively, the "Loan Parties") are party to the Credit Agreement[4] were indebted, jointly and severally, to the Agent and the Lenders party to the Credit Agreement, on a secured basis in the aggregate principal amount together with accrued but unpaid interest and contingent letter of credit obligations (the "Indebtedness") in an amount of not less than $130 million as of December 26, 2019.

10.     In order to secure the Indebtedness, the Debtors, Putative Debtor and the other Loan Parties, granted to the Agent, on behalf of itself and the Lenders, a first-priority security interest in and lien on substantially all of their respective assets, including, without limitation, all of their respective equity interests and distributions on account of equity interests, including, without limitation, any equity interests and distributions on account of the equity interests held by Putative Debtor in the Elite Entities (collectively, the "Debtor Collateral");[5]

---

[4] As used herein the "Credit Agreement" means that certain Credit Agreement dated as of October 28, 2016, by and among Debtors, the Putative Debtor, the other loan parties party thereto, the Agent and the Lenders party thereto as amended and modified by (1) that certain Amendment No. 1 to Credit Agreement and Waiver, dated as of March 3, 2017, (2) that certain Amendment No. 2 to Credit Agreement, dated as of November 15, 2017, (3) that certain Second Limited Conditional Waiver and Amendment No. 3 to Credit Agreement, dated effective as of December 31, 2018, (4) that certain Second Limited Conditional Forbearance Agreement, Consent and Fourth Amendment to Credit Agreement, dated as of April 30, 2019 (as further amended, restated or otherwise modified from time to time, the "Credit Agreement")

[5] The "Loan Documents" include, without limitation: (i) the Credit Agreement, (ii) that certain Guaranty and Security Agreement, dated as of October 28, 2016 (as amended, supplemented, or otherwise modified from time to time, "Guaranty and Security Agreement"), as amended and modified by (1) that certain Reaffirmation and Omnibus Amendment Agreement (the "Omnibus Agreement"), dated as of May 22, 2019, and (iii) that certain Pledge Agreement, dated as of October 28, 2016 as amended, modified and supplemented by (1) that certain Amendment No.1 to Pledge Agreement, dated January 7, 2019, and (2) the Omnibus Agreement (as further amended, amended and restated or otherwise modified from time to time, collectively the "Pledge Agreement").

11.     The Agent and Lenders properly perfected their enforceable, unavoidable, first-priority security interests in and liens on the Debtor Collateral.

## II.  The Elite Entity Operating Agreements

12.     On December 11, 2019, roughly two (2) months after the Debtors filed their voluntary Chapter 7 petitions with this Court, the Petitioning Creditors commenced Houston Case against the Putative Debtor.

13.     Each of the Petitioning Creditors is a Class A member of one or more of the Elite Entities. Specifically, Carl F. Palumbo is a Class A member of Houston Metro Ortho and Spine Surgery Center, LLC; Navin Subramanian is a Class A member of Houston Metro Ortho and Spine Surgery Center and Elite Hospital Management, LLC; the Alan Jeffrey Rechter Heritage Trust is a Class A member of Houston Metro Ortho and Spine Surgery Center, LLC; and OPST – The Surgery Center, LLC is a Class A member of Elite Sinus Spine and Ortho, LLC.  All of the paperwork provided to the Agent from the Petitioning Creditors (and counsel representing both the Petitioning Creditors and other debt holders) indicates that they have unsecured claims solely against the Putative Debtor, and the Agent is not aware of whether such claims qualify under Section 303(b) of the Bankruptcy Code.[6]

14.     As noted above, the Putative Debtor is the owner of all of the Class B membership interests in each of the Elite Entities and holds a greater than fifty percent (50%) interest in each such Elite Entity.

---

[6] It is important to note that certain of the Lenders funded tens of millions of dollars for the Debtors to fund the purchase by the Putative Debtor of the Class B membership interests in each of the Elite Entities, which consideration was paid in part to the Class A members, including the Petitioning Creditors.  The Class A members of the Elite Entities and the Petitioning Creditors are unsecured creditors of the Putative Debtor, whereas the Agent and the Lenders are secured creditors of the Putative Debtor.

15.     As the owner of all of the Class B membership interests in each of the Elite Entities, the Putative Debtor is entitled to its pro rata share of all equity distributions from the Elite Entities. It is important to note that the Elite Entities are self-funded and have historically generated approximately $400,000 to $500,000 of monthly profit distributions to the Putative Debtor, which distributions are subject to the first-priority perfected liens of the Agent. Since the Agent's acceleration of the Indebtedness in September 2019, all such distributions have been remitted by the Putative Debtor to the Agent, for application against the Indebtedness owed jointly and severally by the Debtors, Putative Debtor, and the other Loan Parties.[7]

16.     Under the operating agreement for each of the Elite Entities (collectively, the "Operating Agreements"),[8] the bankruptcy of any Member of the Elite Entities (including an involuntary proceeding against any such Member where an order for relief is entered and remains unvacated and unstayed for an aggregate of 60 days) constitutes an "Adverse Terminating Event." Operating Agreements § 1.12.

17.     Upon the occurrence of such an Adverse Terminating Event, the Operating Agreements provide, in part, that:

> . . . **the Member [i.e., the Putative Debtor] must sell, effective as of the effective date of the Adverse Terminating Event with no rights to distributions or other amounts from the Company [i.e., each Elite Entity] between such effective date and the closing of such sale, such Units [i.e., the Class B membership interests] to the Company [i.e., each Elite Entity] at a price equal to such Member's [i.e., the Putative Debtor's] Capital Account (the "*Adverse Purchase Price*"); provided, however, that if a Terminated Member's Capital Account is equal to zero dollars ($0), then the Adverse Purchase Price shall be one dollar ($1)**. All Members [i.e., including the Putative Debtor] waive any and all rights to contest the use of the Adverse Purchase Price, which use shall be in lieu of an appraisal or other method, for redemptions resulting from Adverse Terminating Events.

---

[7]

[8] Copies of the Operating Agreements are attached hereto as Exhibit "A" and are incorporated herein by reference.

502703937 v10 1205867.00001

Operating Agreements § 4.3(f) (emphasis added) (hereafter, the "<u>Bankruptcy Triggering Event</u>").

18.     Thus, in the event this Court were (a) not to declare that such provisions are unenforceable, and (b) to enter an order for relief against the Putative Debtor upholding the involuntary bankruptcy case commenced by the Petitioning Creditors, and such order remained unvacated and unstayed for a period of 60 days, then under the Operating Agreements the Putative Debtor would have <u>no</u> right to further profit distributions and would be required to sell its Class B membership interest in each Elite Entity back to such Elite Entity for a purchase price equal to the Putative Debtor's capital account at such Elite Entity.

19.     The Agent understands that the Putative Debtor's capital account at each Elite Entity is $0 and so the Putative Debtor would be compelled to sell its majority equity interests in each such Elite Entity at the nominal price of $1.

20.     All of the value of the Class B membership interests owned by the Putative Debtor would "by default" inure to the benefit of the Petitioning Creditors and other Class A members similarly situated, all to the detriment of the Putative Debtor, the Debtors' estates, and the Agent and the Lenders.

21.     This Court should prevent such gross injustice – which would otherwise result in the loss to the Debtors (and the Putative Debtor) – and of course a loss to the Agent and the Lenders of millions of dollars of asset value and would improperly advance the interests of the Petitioning Creditors and the other Class A equity holders of each of the Elite Entities.

## <u>RELIEF REQUESTED</u>

22.     By this Motion, the Agent requests entry of the Proposed Order, substantially in the form attached hereto as **<u>Exhibit A</u>**, transferring the venue of the Houston Case to this Court.

8

## BASIS FOR RELIEF

**I.      This Court is an Appropriate Venue Under 28 U.S.C. § 1408.**

23.      Section 1408 of title 28 of the United States Code provides that bankruptcy cases

may be commenced in the district "in which the domicile, residence, principal place of business in

the United States, or principal assets in the United States" of the debtor is located or the district

"in which there is a pending case under title 11 concerning such person's affiliate." 28 U.S.C. §

1408.

24.      Further, under Rule 1014(b) of the Federal Rules of Bankruptcy Procedure,

> If petitions commencing cases under the Code or seeking recognition under chapter
> 15 are filed in different districts by, regarding, or against (1) the same debtor, (2) a
> partnership and one or more of its general partners, (3) two or more general partners,
> or (4) *a debtor and an affiliate, the court in the district in which the first-filed*
> *petition is pending may determine, in the interest of justice or for the convenience of*
> *the parties, the district or districts in which any of the cases should proceed.* The
> court may so determine on motion and after a hearing, with notice to the following
> entities in the affected cases: the United States trustee, entities entitled to notice
> under Rule 2002(a), and other entities as the court directs. The court may order the
> parties to the later-filed cases not to proceed further until it makes the
> determination.

Fed. R. Bank. P. 1014(b).

25.      Under the Bankruptcy Code the term "affiliate" includes, among other things, an:

> (A) entity that directly or indirectly owns, controls, or holds with power to
> vote, 20 percent or more of the outstanding voting securities of the debtor,
> other than an entity that holds such securities--
>> (i) in a fiduciary or agency capacity without sole discretionary power
>> to vote such securities; or
>> (ii) solely to secure a debt, if such entity has not in fact exercised
>> such power to vote;

26.      Each of the Debtors is an "affiliate" of the Putative Debtor, as Northstar

Acquisitions directly owns all interests (including voting interests) in the Putative Debtor, while

both Northstar Holdings (100% owner of Northstar Acquisitions) and Nobilis (100% owner of

9

Northstar Holdings) indirectly "own[], control[], or hold[]" such interests of their respective wholly-owned subsidiaries.

27.    The Houston Case is substantially related to the Debtor Cases in that the parties' "affiliate" status effectively results in any decision rendered with respect to any of the Debtors being one that significantly impacts the Putative Debtor and vice versa, particularly with respect to the implications of decisions related to the Debtor Collateral, property of the Debtors' estates, and the Indebtedness secured by the Debtor Collateral and guaranteed by each of the Debtors and the Putative Debtor.

28.    Thus, this Court satisfies the statutory venue requirements under 28 U.S.C. § 1408.

## II.    The Court Should Exercise its Discretion to Transfer Venue from the Houston Court to This Court

29.    It is within this Court's discretion to transfer a proceeding under the Bankruptcy Code to another venue if it is "in the interest of justice or for the convenience of the parties." 28 U.S.C. § 1412;[9] *see In re Qualtec Inc.*, No. 11-12572 (KJC), 2012 WL 527669, at *6 (Bankr. D. Del. Feb. 16, 2012); *In re Directory Distrib. Assocs., Inc.*, 566 B.R. 869, 882 (Bankr. S.D. Tex. 2017) ("Further, regardless of the Plaintiffs' choice of forum, the decision to transfer is within this Court's discretion."). This statute thus creates two distinct bases upon which transfer of venue may be granted: interest of justice *or* convenience of the parties. *Qualtec Inc.*, 2012 WL 527669, at *6. The same standards apply to the analysis of whether to transfer venue under Rule 1014 of the Federal Rules of Bankruptcy Procedure. *See In re Innovative Commc'n Co., LLC*, 358 B.R. 120, 129 (Bankr. D. Del. 2006); *In re Reichmann Petroleum Corp.*, 364 B.R. 916, 922 (Bankr. E.D.

---

[9] "The only substantial difference between [§ 1404 and § 1412] is the additional requirement under § 1404(a) that an action may be transferred to any place where venue could have been valid originally." *Sabre Techs., L.P. v. TSM Skyline Exhibits, Inc.*, No. CIV.A. H-08-1815, 2008 WL 4330897, at *8 (S.D. Tex. Sept. 18, 2008). Thus, as there can be no dispute that the Houston Case could have originally been brought in this Court in light of the pending Debtors' (i.e., "affiliates'") Cases, this Motion focuses on the factors for transfer under § 1412, but seeks transfer pursuant to § 1412 or, in the alternative, § 1404.

Tex. 2007).

30.     A party seeking to transfer venue has the burden of showing that a transfer is warranted based on the preponderance of the evidence. *Qualtec Inc.*, 2012 WL 527669, at *5.

31.     In determining whether a venue transfer would serve the convenience of the parties, courts typically consider a number of separate factors:

> 1. the proximity of creditors of every kind to the Court;
> 2. the proximity of the debtor to the Court;
> 3. the proximity of the witnesses necessary to the administration of the estate;
> 4. the location of the assets;
> 5. the economic administration of the estate; and
> 6. the necessity for ancillary administration if liquidation should result.

*In re Rests. Acquisition I, LLC*, No. 15-12406 (KG), 2016 WL 855089, at *2 (Bankr. D. Del. Mar. 4, 2016) (*quoting Commonwealth of Puerto Rico v. Commonwealth Oil Refining Co. (In re Commonwealth Oil Refining Co.)*, 596 F.2d 1239, 1247 (5th Cir. 1979)).

32.     Similarly, "'[t]he interest of justice component of Section 1412 is a broad and flexible standard which must be applied on a case-by-case basis. It contemplates a consideration of whether transferring venue would promote the efficient administration of the bankruptcy estate, judicial economy, timeliness, and fairness....'" *In re Caesars Entm't Operating Co., Inc.*, No. 15-10047 (KG), 2015 WL 495259, at *7 (Bankr. D. Del. Feb. 2, 2015) (internal quotation marks omitted) (citation omitted); *see also In re Safety-Kleen Corp.*, No. 00-02303(PJW), 2001 WL 1820321, at *2 (Bankr. D. Del. Aug. 27, 2001).

33. Stated in another way, this Court has indicated that it considers:

> 1) the location of the plaintiff and defendant;
> 2) the ease of access to the necessary proof;
> 3) the availability of subpoena power for the unwilling witnesses;
> 4) the expense related to obtaining willing witnesses;
> 5) the enforceability of any judgment rendered;
> 6) the ability to receive a fair trial;
> 7) the state's interest in having local controversies decided within its borders, by those familiar with its law; and
> 8) the economics of the estate administration.

11

*In re Hechinger Inv. Co. of Del., Inc.*, 288 B.R. 398, 402–03 (Bankr. D. Del. 2003) (citations omitted); *see also In re Ocean Props. of Del., Inc.*, 95 B.R. 304, 305 (Bankr. D. Del. 1988 (considering "the proximity of the court to interested parties as well as the location of assets, the economics of administering the estate and the relative economic harm to debtor and other interested parties"); *Campbell v. Williams*, No. 1:14-CV-097, 2015 WL 3657627, at *3 (S.D. Tex. June 12, 2015) (considering substantially similar factors).

34.     Here, the Agent seeks the transfer of the Houston Case to this Court primarily because (i) there are three (3) other ongoing bankruptcy cases involving the Putative Debtor's affiliates already pending before this Court (i.e., the Debtors) thereby subjecting this family of entities to insolvency proceedings before this Court, and a second court (i.e., the Houston Court) would be inefficient and ineffective, (ii) this Court is most familiar with the parties and facts of these cases, (iii) judicial efficiency and economy favor transferring the Houston Case to this Court, (iv) the interests of justice require it (particularly in light of the bad-faith nature of the Petitioning Creditors' involuntary petition), and (v) importantly, the determination of whether a declaration invalidating the ipso facto clauses or whether an order for relief can or should be entered will substantially and adversely affect the bankruptcy cases  (including distributions and other relief to creditors) in each of the Debtor Cases.

## A.     Transfer Would Serve the Interests of Justice

35.     As noted above, when determining whether a transfer would serve the interests of justice, the factors above typically boil down to an inquiry as to whether the transfer "would promote the efficient administration of the estate, judicial economy, timeliness, and fairness." *Caesars*, 2015 WL 495259, at *7 (Bankr. D. Del. Feb. 2, 2015) (citations omitted); *see also In re Crosby Nat'l Golf Club, LLC*, 534 B.R. 888, 890–91 (Bankr. N.D. Tex. 2015) ("When undertaking the 'interest of justice' analysis, I am to consider (a) the venue in which the estate can be most

efficiently administered, (b) the venue that will promote judicial economy and efficiency, (c) the parties' ability to receive a more fair trial in one forum versus another, and (d) a state's interest in having local controversies decided within its borders.").

### 1.    Judicial Economy and Risk of Inconsistent Decisions.

41.    Judicial economy would be served by transferring the Houston Case to this Court. As of the time of the filing of this Motion, the Houston Court has held no hearings in the Houston Case and the Putative Debtor and the Agent still have time within which they may file their responses to the involuntary petition in the Houston Case under Rule 1011 of the Federal Rules of Bankruptcy Procedure. In contrast, the Debtor Cases are all pending before this Court, which has administered those cases for more than two months, considered numerous motions, and entered various orders in those proceedings.

42.    As discussed above, the proceedings in the Houston Case and the Debtor Cases pending before this Court will inevitably have substantial effects on each other, including, among other things, implications of decisions related to the Debtor Collateral, property of the Debtors' estates, and the Indebtedness secured by the Debtor Collateral and guaranteed by each of the Debtors and the Putative Debtor.  The Putative Debtor is in the middle of the org chart of the Debtors and their affiliates and its administration other than in this Court may result in chaotic intercompany offsetting claims, competing automatic stays and duplication in administrative time and costs, all to the detriment of creditors.

41.    Indeed, while some courts have traditionally emphasized the "learning curve" that might require the transferee court to become familiar with a transferred case, *see Rests. Acquisition*, 2016 WL 855089, at \*2; *see also In re Manville Forest Prod. Corp.*, 896 F.2d 1384, 1391 (2d Cir. 1990), this case presents a unique circumstance in that the "learning curve" that typically militates against a transfer actually supports transfer to this Court and the policy behind

13

the "first to file" Court making such determination. This is because the proposed transferee court, this Court, is familiar with the background facts involving these various interrelated cases and would be *best* positioned to hear the proceedings in the Houston Case in conjunction with the proceedings in the Debtor Cases, while the Houston Court would have a substantial learning curve given that it has no background on any of these cases and has no familiarity with the either the Debtors or the Putative Debtor at this time and would be faced with potential conflicts among the cases that it would be extremely difficult to reconcile on its own.

42.    Moreover, if the Houston Case is not transferred, there is a substantial risk that the Houston Court and this Court will, over the course of parallel proceedings, render conflicting decisions related to the Credit Agreement and related loan documents as well as the Operating Agreements, which will be at issue in the Houston Case as well as the Debtor Cases before this Court. However, by transferring and assuming jurisdiction over the Houston Case, this Court could ensure that these matters are subject to consideration by a single court in each instance.

43.    Thus, judicial economy would best be served by utilizing the time and resources already extended by this Court in connection with the Debtor Cases, and the risk of inconsistent judicial determinations would be substantially minimized. This factor weighs strongly in favor of transfer.

2.    **Location of the Parties/Economic and Efficient Administration of the Bankruptcy Estate**.

44.    In addition, there are economic and administrative reasons to transfer the Houston Case to this Court, along with considerations regarding the location of the parties and potential witnesses. As noted above, "promot[ing] the efficient administration of the estate" and case is a significant factor in the transfer analysis. *E.g.*, *Caesars*, 2015 WL 495259, at *7 (Bankr. D. Del. Feb. 2, 2015) (citations omitted).

45.    Here, counsel for the Chapter 7 Trustee for the Debtors' estates, the Chapter 7

14

Trustee, and counsel for the Agent are already participating in proceedings in this Court. Thus, if the Houston Case is transferred to this Court, the parties should not need to hire new counsel to be caught up to speed, nor should they incur travel expenses that would necessarily result if the cases were to proceed in separate venues, particularly where the two venues are more than 1,500 miles and a three-hour flight apart. Moreover, while the Putative Debtor is a Texas limited liability company, and its Petitioning Creditors appear to be based primarily in Texas, the Putative Debtor's most significant creditors (i.e., the Agent and the Lenders) are already participating in proceedings in this Court. As such, both creditors and relevant witnesses are likely to be involved in proceedings in Delaware regardless of whether the case is transferred, meaning that the transfer would be more beneficial and efficient for those persons and entities. This would also ensure that the costs of witness attendance at hearings is minimized. *Rests. Acquisition*, 2016 WL 855089, at *2

46.     There can be little doubt that transferring venue to this Court would promote the economic and efficient administration of the Houston Case and would properly account for the location of the parties. This factor weighs in favor of transfer.

### 3.     Timeliness.

47.     As of the date of this Motion, the Houston Case has only been pending for twenty-one (21) days, and the Putative Debtor was not served with the involuntary petition until December 17, 2019. Thus, the Putative Debtor and the Agent are not yet been required to respond to the involuntary petition in the Houston Case, and it has through at least January 7, 2019, to do so. This Motion is timely and this factor weighs in favor of transfer.

### 4.     <u>Integrity of the Bankruptcy Court System – Forum Shopping and Bad Faith Filing</u>

48.     Moreover, in addition to the usual factors considered in evaluating the interests of justice, courts may also look to issues such as preservation of the bankruptcy court system,

including by analyzing issues such as forum shopping, bad faith filings, and other equitable considerations in determining whether transfer is appropriate. *In re Steeley*, 243 B.R. 421, 441 (Bankr. N.D. Ala. 1999) ("In addition to the above, and more importantly in regards to the particular circumstances of the pending matters, this Court has also considered the standard of 'in the interest of justice' in the light of this Court's finding that this case was filed in bad faith. In that regard, without question, the 'interest of justice' would not be served if the debtor is allowed to remain in this Division. While 'venue' may be proper in more than one division, *justice* is not proper in this Division at this time. As this Court has already found that the filing of the petition in this Division was 'an intent to abuse the judicial process,' the Court must now find that 'in the interest of justice' this case must, at a minimum, be transferred."); *In re Eclair Bakery Ltd.*, 255 B.R. 121, 142 (Bankr. S.D.N.Y. 2000) ("The Court considers that the interests of justice also warrant transfer for another reason. The Court has found as a fact that this case was filed in the Southern District for 'forum shopping'—to try out the Southern District, after repeated unfavorable rulings, and a restrictive order, in the Eastern District. The interests of justice require that this Court not reward such an effort. This Court believes it appropriate to add as an additional relevant factor, though it may rarely be applicable, the integrity of the Bankruptcy Court system."); *see also In re First Conn. Consulting Grp., Inc.*, 340 B.R. 210, 222 (D. Vt. 2006) ("[I]in issues of bad faith a bankruptcy court is advised to use its equitable powers to reach an appropriate result in individual cases."), *aff'd,* 254 F. App'x 64 (2d Cir. 2007).

49.     Here, the facts strongly lead to one conclusion: the Petitioning Creditors commenced the involuntary case against the Putative Debtor in bad faith in an effort to collect their unsecured debt and to improperly advance their interests as claimholders against the Putative Debtor and equity holders in the Elite Entities given that, among other things: (i) the sole property interests of the Putative Debtor are its membership interests in the Elite Entities and any

16

distributions made to the Putative Debtor on account thereof, (ii) the membership interests owned by the Putative Debtor (together with any and all rekated distributions received by the Putative Debtor) are subject to the first-priority, unavoidable, perfected liens of the Agent securing the repayment of approximately $130 million of indebtedness owed by the Debtors, the Putative Debtor and certain of their affiliates, and (iii) if an order for relief is entered against the Putative Debtor, then by reason of the Bankruptcy Triggering Event, millions of dollars of collateral owned by the Putative Debtor are inequitably transferred to the benefit of the Petitioning Creditors and those other equity holders in the Elite Entities that are similarly situated.

50.    In short, as a result of the Bankruptcy Triggering Event in the Operating Agreements, the Petitioning Creditors are seeking to cause a forfeiture of millions of dollars of assets owned by the Putative Debtor and subject to the first-priority perfected liens of the Agent and the Lenders so that value would instead be redirected exclusively to their benefit.

51.    The Petitioning Creditors should not be permitted to abuse the judicial process by initiating involuntary bankruptcy proceedings for their sole benefit, knowing that the proceedings will effectively deprive the Putative Debtor and its creditors, primarily, the Agent and the Lenders, to lose these valuable assets, particularly when three other bankruptcy cases of affiliates are ongoing in the Debtor Cases before this Court. Indeed, this Court has recognized as much in prior decisions. *See In re Diamondhead Casino Corp.*, No. 15-11647(LSS), 2016 WL 3284674, at *19 (Bankr. D. Del. June 7, 2016) (recognizing that "the basic principle that stockholder disputes are not appropriately remedied by an involuntary petition holds true" and finding that petitioning creditors' efforts to effectuate changes in corporate management and to use involuntary proceeding as a "collection device" to collect on promissory notes was an improper purpose).

52.    Rather, the interests of justice require this Court intimately familiar with the Debtors' estates, the Collateral of the Agent and the Lenders, and the Indebtedness owing to the

Agent and the Lenders, to evaluate the nature of the involuntary petition in this case, and its effects on other creditors, to fully determine whether the filing was, in fact, in bad faith.

> 5.    **Fairness**.

53.    Transferring this case to a venue (i.e., this Court) where creditors and numerous other parties-in-interest (1) are already participating in the related Debtor Cases, and (2) may more easily participate in the restructuring process generally would undoubtedly be fair. Indeed, as this case is an involuntary proceeding, it only makes sense that it would be fairest to hold proceedings in this case where the Putative Debtor's parent companies are proceeding and where creditors are already participating in ongoing bankruptcy proceedings related to those entities.

> **B.    <u>Transfer Would Be Most Convenient for Most Parties</u>**

36.    Likewise, as noted above, in evaluating whether a transfer is warranted for the convenience of the parties, courts consider a number of factors related to the economic efficiencies of transfer and certain fairness considerations. Here, the convenience of the parties favors transferring the Houston Case to this Court.

> 1.    **Choice of Forum/Home Court**

54.     While some courts consider a presumption in favor a voluntary debtor's choice of venue or in favor of the "home court," *In re Restaurants Acquisition I, LLC*, No. 15-12406 (KG), 2016 WL 855089, at *2 (Bankr. D. Del. Mar. 4, 2016), the Putative Debtor did not initiate the Houston Case, which was commenced as an involuntary proceeding by the Petitioning Creditors. Accordingly, this factor is substantially lessened. Indeed, other courts, including those in the Southern District of Texas, from which the Houston Case would be transferred, have recognized that there can be no "home court presumption" under a transfer analysis. *In re Lucas*, No. 12-33600, 2012 WL 5198368, at *3 (Bankr. S.D. Tex. Oct. 19, 2012) ("[T]he Fifth Circuit has held that a party's choice of forum should be given little, if any weight in venue analysis.

Although *Volkswagen* was not a bankruptcy case, this Court has previously found that the same analysis undercuts a home court presumption in bankruptcy cases as well." (citing *Encana Oil & Gas (USA) Inc. v. TSC Sieber Servs., L.C.*, No. 3:09-CV-1791-M, 2010 WL 3385018, at *2 (N.D. Tex. Aug. 20, 2010)

55.     Accordingly, despite the fact that the Petitioning Creditors filed the involuntary petition with the Houston Court, there need not be any presumption that the selected forum is the correct forum. Rather, this Court need only consider the facts noted above demonstrating objectively that (1) this Court is an appropriate venue for the Houston Case, and (2) the Houston Case would best proceed before that Court in light of its relation to the Debtor Cases.

### 2.     Ability to Receive a Fair Trial

56.     While the Court should consider the parties' ability to receive "a fair trial" (or, in the bankruptcy context, fair administration of the case and potential trials of adversary proceedings), *Hechinger*, 288 B.R. at 402–03, this Court can fairly adjudicate the proceedings in the Debtor Cases and, given its familiarity with those cases, it would be more than competent to fairly and appropriately oversee proceedings in the Houston Case if transferred.

### 3.     Enforceability of Judgment

57.     Similarly, any judgments entered in the case by this Court will have equal enforceability as if there were entered by this Court. Under applicable federal law:

> [a] judgment in an action for the recovery of money or property entered in any court of appeals, district court, bankruptcy court, or in the Court of International Trade may be registered by filing a certified copy of the judgment in any other district or, with respect to the Court of International Trade, in any judicial district, when the judgment has become final by appeal or expiration of the time for appeal or when ordered by the court that entered the judgment for good cause shown. Such a judgment entered in favor of the United States may be so registered any time after judgment is entered. *A judgment so registered shall have the same effect as a judgment of the district court of the district where registered and may be enforced in like manner.*

28 U.S.C. § 1963 (emphasis added).

502703937 v10 1205867.00001

58.    Thus, this factor militates in favor of transferring the Houston Case.

**4.    Economics of Administration and Judicial Efficiency**

59.    Just as courts consider both the economics of administration of a bankruptcy case and judicial efficiency in evaluating the interests of justice, courts also consider these factors in evaluating the convenience of the parties. *See Qualteq*, 2012 WL 527669, at *6 (considerations arise in both prongs); *see, e.g.*, *Rests. Acquisition*, 2016 WL 855089, at *2 (listing in the "convenience of the parties") prong; efficient administration of the bankruptcy estate, judicial economy, timeliness, and fairness...."" *Caesars*, 2015 WL 495259, at *7 (considering "efficient administration of the bankruptcy estate"); *Hechinger*, 288 B.R. at 402–03 (considering economic factor generally rather than under a particular prong).

60.    For the reasons discussed in more detail above, including the ongoing Debtor Cases and the inevitable overlap between the ongoing cases, and potential conflicts between them, as well as the participation of the Putative Debtor's creditors in these proceedings, transferring the Houston Case to this Court would be economically and judicially efficient. *See Sabre*, 2008 WL 4330897, at *9 ("Allowing the bankruptcy court to adjudicate the core claims involved in this case, as well as the other related claims, promotes the efficient administration of the bankruptcy estate. This factor thus favors transferring the case.").

**5.    Necessity for Ancillary Administration If Liquidation Should Result**

61.    In the event that liquidation results from the Houston Case, ancillary administration would, of course, be necessary. However, given this Court's familiarity with the Debtor Cases and the fact that the Chapter 7 Trustee controls the Debtors and indirectly could exercise control over the Putative Debtor, any such ancillary proceedings should

present no impediments to this Court's administration of the proceedings.

## CONCLUSION

62.    For the foregoing reasons, it is both in the interest of justice and for the convenience of the parties that this case should be transferred to this Court. As such, the Agent respectfully requests that this Court transfer venue of the Houston Case to this Court.

## NOTICE

63.    Notice of this Motion will be provided to (i) the Putative Debtor, (ii) the Office of the United States Trustee for the District of Delaware, and (iii) any party that has requested notice pursuant to Local Rule 2002-1 as of the date of this Motion in any of the above-referenced bankruptcy proceedings. In light of the nature of the relief requested herein, the Agent submits that no other or further notice is necessary.

**WHEREFORE**, the Agent respectfully requests that the Court enter the proposed Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and granting such other and further relief as the Court may deem just and proper.

21

**DATED** this 1st day of January, 2020

Respectfully submitted,

**DLA PIPER**

By: /s/ *Stuart M. Brown*
Stuart Brown, Esq. (DE #4050)
1201 North Market Street, Suite 2100
Wilmington, Delaware, 19801
Telephone: (302) 468-5640
Fax: (302) 394-2341

- and -

**K&L GATES LLP**


By: /s/ *David Weitman*

David Weitman, Esq.
Texas State Bar No. 21116200
Christopher A. Brown, Esq.
Texas State Bar No. 24040583

1717 Main Street, Suite 2800
Dallas, Texas 75201
Phone: (214) 939-5500
FAX: (214) 939-5849

**ATTORNEYS FOR BBVA USA, AS AGENT**